## Meyers v. Shearson Lehman Hutton

### Case No. 11586
### Montgomery County, (2nd)
### Decided February 8, 1990
[Cite as 1 AOA 47]

*Dennis A. Lieberman, 318 West Fourth Street, Dayton, Ohio 45402, Attorney for Appellee-Cross/Appellant*

*Robert P. Bartlett, 600 IBM Building, Dayton, Ohio 45402, Attorney for Appellant-Cross/Appellee*

BROGAN, J.

Shearson Lehman Hutton, appellant, and Robert David Meyers, appellee cross-appellant, appeal the judgment of the trial court reflecting a jury verdict in favor of Meyers.

On April 1, 1988, Meyers filed his complaint against Shearson Lenman Hutton, (Shearson), wherein three causes of action were set forth.

Count one contained a cause of action for breach of written employment contract, count two contained a cause of action for breach of oral contract, count three contained a cause of action for tortious interference with a business contract.

Meyers prayed for monetary damages as follows:

(1) Monetary damages for breach of contract in the amount of approximately $50,000.00.

(2) Monetary damages for the interference of business contracts in the approximate amount of $100,000.00.

(3) Punitive damages in the approximate amount of $100,000.00.

On June 10, 1988, following the grant of an extension of time to file an answer, Shearson moved to stay proceedings and refer the matter to arbitration. This motion was based upon an employment application generated by Shearson and completed by Meyers, discussed more fully *infra*, wherein Meyers allegedly agreed to arbitrate any controversy with Shearson. Shearson argued that this application comprised a legally enforceable employment contract. The trial court overruled this motion citing its prior decision in the case of *Patterson and BancOhio Co-Executors* v. *Merill Lynch, Pierce, Fenner & Smith* (July 21, 1988), Montgomery County Court of Common Pleas, Case No. 88-1118, unreported, wherein the court held that a signed employment application, while perhaps enforceable, is not contractually sufficient to create employment rights. Further, the court found the application lacking in consideration with regard to the arbitration provision. In its answer, Shearson did not plead the affirmative defense of arbitration.

On December 12, 1988, Shearson filed its answer. Thereafter, on February 13 and 14, 1989, a jury trial was held and the following evidence was adduced.

In the spring of 1987, Meyers, a stockbroker employed by Prudential-Bache, engaged in negotiations with Larry Hayes, a Senior Vice President of Shearson, regarding employment with Shearson. (Tr. 34-35). These negotiations included a number of meetings where the parties discussed Meyers' salary and his need of an assistant. (Tr. 35). On August 28, 1987, Hayes sent a letter to Meyers stating,

> Obviously I am quite excited about your move to Shearson Lehman and let me just suggest that I will do everything to make your transition as smooth as possible. Over the next few weeks, you will certainly get to know Marcella Lehar, my Administrative Manager, as far as preparing mailing lists, account documentation, etc. Just to put on paper and review our financial deal, I was able to get Mr. Kobak to go for the following guarantee:
>
> - $11,000 Monthly guarantee for 6 months vs a 50% payout whichever is greater.
> - You will have retroactive Bogy levels of 60% at $200,000, 65% at $250,000, 70% at $300,000. There will be a red ink stop-loss at $33,000 although all accelerated payouts continue.

> Bob, obviously we will have time to review any concerns and I will look forward to talking to you next week. Believe me, with your production, you will keep some of our current young FC's on their toes.

(Plaintiff's Ex. 1). Meyers testified to his belief that this letter reflected "the final terms and conditions of employment" with Shearson. (Tr. 37). Meyers indicated: "That figure was negotiated between myself and Mr. Hayes as an income level for myself, $ 11,000 monthly guaranty for at least six months * * *." (*Id.*) Counsel for Shearson did not object to the introduction of this evidence reflecting Meyers' interpretation of the letter of August 28.

Subsequently, Meyers agreed to begin work at Shearson on September 25, 1987. (Tr. 38). On September 7, 1987, Meyers completed a document from Shearson entitled "Application for Employment" (Defendant's Ex. D). (*Id.*) The employment application contained these questions, among others, to which Meyers responded, "no":

> Has any permanent or temporary injunction ever been entered against you?

> In your previous business connections or employment in any capacity, have transactions under your attention ever been the subject of complaint or irregular proceeding?

> Are you now or have you ever been subject to an order of the S.E.C. or any other regulatory agencies or association which bars or suspends you from becoming associated with a broker-dealer?

Further, the employment application contained a section entitled, "Representation by Applicant" which contained, *inter alia*, the following sections:

> I understand that any employment by Shearson Lehman Brothers Inc. ("Shearson Lehman") or its subsidiary companies is conditioned upon positive responses from my references, acceptance by the bonding company, continued adherence to Shearson Lehman's rules and regulations and job performance satisfactory at all times to Shearson Lehman.

> * * *

I understand that my status is that of an employee at will, meaning that I have no contractual right, express or implied, to remain in Shearson Lehman's employ. In consideration of my employment, I specifically agree that my employment or the terms and conditions thereof including compensation, can be changed or terminated with or without cause, and with or without notice, at any time, at the option of Shearson Lehman. I understand that no representative of Shearson Lehman other than Human Resources Department in conjunction with a corporate officer has any authority to enter into any agreement for employment for any specified period of time or make any agreement contrary to the foregoing.

\* \* \*

I hereby represent and warrant that all my answers on this application are true and accurate. I understand that any misrepresentation of facts, failure to disclose information required on this application or material change in any information provided which is not reported to Human Resources shall be cause for dismissal regardless of when discovered by Shearson Lehman.

I hereby agree that any controversy arising out of or in connection with my compensation, employment or termination of employment shall be submitted to arbitration before the National Association of Securities Dealers, Inc., the New York Stock Exchange, Inc. or the American Stock Exchange Inc. and be resolved in accordance with the rules, then in effect, of such entities. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof. In the event I fail to abide by these terms, this section shall in no way limit or impair the Company's other legal rights, including the right to enforce said provisions in a court of competent jurisdiction.

Regarding his familiarity with the above-stated provisions, Meyer testified: "I was just told to put previous employment history, my education, experience, and to sign it and that's what I did." (Tr. 93). Meyers testified that he did not read the provision purporting to characterize Meyer's position as one of employment at will or the assertion purporting to deny the authority of any Shearson representative, other than Human Resources, to offer employment for a specified time period.

Meyers left his position at Prudential-Bache on September 25, 1987 and began working at Shearson on that date. (Tr. 39). During the week prior to his departure from Prudential-Bache, Meyers appropriated from that firm numerous documents including account statements, signature guaranties, "tickets" and new account forms. (Tr. 46, 67). Some of these documents pertained to his own clients while others pertained to clients of other brokers. (Tr. 67).

Meyers testified as to a two-fold purpose for the taking of these documents. First, he "took those documents \* \* \* because of some wrongdoings going on at Prudential-Bache Securities. [He] was going to give testimony to some different security regulatory agencies that monitor the transactions of brokerage firms." (Tr. 46).

The documents allegedly reflected forged signatures and unauthorized trading. (*Id.*) Second, Meyers took the documents to obtain "a list of potential clients." (Tr. 48). In this respect, Meyers admitted: "The second reason I took those documents was wrong. I had signed a contract in July of 1985 with Prudential-Bache Securities that I was not to take any documents with me if I ever left their employment." (Tr. 47).

From September 25 through September 30, 1987, Meyers was employed by Shearson. On September 30, 1987, both Meyers and Shearson were served with a Temporary Restraining Order stating, in pertinent part:

Defendant, Robert D. Meyers, as well as his agents, servants, employees, attorneys and those persons in active concert or participation with Defendant who receive actual notice of this Order

a) disclosing, destroying, secreting or in any way using Plaintiff's Monthly Statements and New Account Forms or copies or summaries thereof, however generated or retained pertaining to clients other than those of Defendant while employed by Prudential Bache Securities, Inc., and

b) Communicating with and/or contacting clients of Prudential Bache Securities, Inc. other than those of Defendant while

employed by Prudential Bache Securities, Inc. (Tr. 48, 51); (Defendant's Ex. C).

On September 30, 1987, Meyers spoke to Hayes via telephone. Hayes, in New York City, instructed Meyers "not to come in the office until he was back from New York." (Tr. 53). On November 1 or 2, 1987, Hayes informed Meyers that he was indefinitely suspended. Meyers testified that on no occasion was he given an opportunity to explain his actions to a Shearson representative. (Tr. 53-54).From September 30 through November 13, 1987, Meyers had no access to his clients as all of his records were in Shearson's offices to which he was denied entry. (Tr. 54).

On November 14, 1987, Meyers met with Hayes. Hayes requested that Meyers resign his position; when Meyers refused, he was terminated. (Tr. 54). A few days later, Meyers' records were returned to him and he began to search for new employment. (Tr. 55).

On November 20, 1987, an Agreed Permanent Order of Possession was filed granting Prudential-Bache permanent possession of all documents taken by Meyers other than those pertaining to Meyers' own clients. (Defendant's Ex. E). Although counsel for Shearrson moved that all of the misappropriated documents be put into evidence. The court overruled the motion stating:

> Well, the fact that it is undisputed that he took certain records and they have been characterized as to the nature of the record, they add nothing to the reason for the questioning of the Plaintiff and the reason for terminating or suspending Mr. Meyers on September 30th. Their general nature is simply acknowledged and undisputed so we will not admit "A". (Tr. 180).

The testimony of Montford Will, Senior Vice-President of the Columbus branch of Blunt, Ellis and Loewi, revealed that Meyers was hired as a stockbroker by that firm on or about November, 1987. (Tr. 104). The hiring took place after a number of interviews with Meyers. Will indicated that Meyers disclosed his taking of the Prudential-Bache documents. It was Will's opinion that both Prudential-Bache and Shearson overreacted to Meyers' action. (Tr. 103-104).

Will testified with respect to the transfer of Meyers' security license from Shearson to Blunt Ellis and Loewi (Blunt). The transfer involves the completion of a U-4 form processed through the Central Registration Department of the New York Stock Exchange and includes a verbal security clearance from a broker's prior employer to the new employer. (Tr. 104-106).

The verbal security clearance permits the new employer to inquire as to the prior employer's knowledge of any wrongdoing by or potential problems concerning the broker in question. (Tr. 105). The prior employer has the option of either providing security clearance or denying it. If clearance is denied, the transfer of the license is delayed. (Tr. 108-109).

Will testified in the instant case, he telephoned Hayes to obtain clearance but Hayes refused to provide any information regarding Meyers. (Tr. 108). The lack of response from Hayes delayed the initial hiring of Meyers more so than it delayed the transfer of his license. (Tr. 110). However, Will did indicate that "it [would] have been quicker to get the security clearance or transfer if [Hayes] had refused to give a security clearance and stated his reason why." (Tr. 109). Meyers was able to begin selling securities at Blunt on or about January 20, 1988. (Tr. 57).

The issue of damages was addressed by Meyers on direct examination. He testified that he was denied access to his clients for two reasons: (1) Shearson held his records from October 1, 1987 through November 13, 1987 and (2) his securities license did not transfer to Blunt until January 21, 1988. (Tr. 58). During this time, on October 19, 1987, the stock market crashed.

Meyers was entirely unable to communicate with his clients because Shearson was holding his records. (Tr. 55).

At the time of trial, Meyers had saved "roughly eighteen to twenty percent" of his clients. (Tr. 59). Therefore, he estimated, based on prior commissions and tax returns, that he lost approximately $65,000 in commissions. (Tr. 61). While at Blunt, Meyers earned a salary of $4,000 in December 1987, a salary of $3,000 in January 1988, and commissions of $2,400, $3,200 and $3,200 in January, February and March of 1988, respectively. (Tr. 58, 61-62).

Hayes, the final witness, testified that in his opinion, Meyers was dishonest. (Tr. 136). Hayes disclosed that on September 28, 1987, he confronted Meyers regarding his taking of documents from Prudential-Bache and Meyers allegedly denied his actions. (Tr. 167-168). However, Hayes admitted to having no evidence

that Meyers falsely answered any questions on his employment application.

Hayes indicated that the letter sent to Meyers on August 28, 1987 was not intended to be a "finalized agreement of employment." (Tr. 121). Rather, "[t]here are many other forms that have to be signed and processed through the Registration Departments of the firms accepted by the New York Stock Exchange * * * to finally contemplate * * * * an employment agreement with the firm." (*Id.*) These forms include permission for a credit and criminal check, personal references, a new hire form setting forth job title and compensation, and a U-4 form, all of which were provided to the jury. (See Defendant's Ex.'s D,F,H,I and Plaintiff's Ex. 3).

Following the presentation of all evidence, Shearson moved for a directed verdict on counts one and three of the complaint: breach of written contract of employment and tortious interference. (Tr. 187-188).

The trial court sustained the motion as to count three, finding no duty of the part of Shearson to supply information to Blunt. The mere refusal to provide information did not constitute sufficient affirmative interference. (Tr. 191-192).

Following closing arguments and receipt of instructions, the jury returned with a verdict of $115,200 in favor of Meyers. On March 31, 1989, Sherson moved for a judgment notwithstanding the verdict or new trial and remittitur. Shearson argued that as a matter of law, Meyers' employment with Shearson was "at will."

Further, if an express contact of employment did exist, Shearson terminated it for "just cause" as a mater of law. If the court would not grant a judgment notwithstanding the verdict, Shearson prayed for a new trial. Additionally, Shearson argued that Plaintiff's prayer for damages amounted to only $50,000 for the single issue tried by the jury after the court directed a verdict on count three. Further, even these damages were argued to be speculative as based on Meyers' estimated income.

The trial court overruled the motion with respect to the request for a j.n.o.v. and a new trial but granted the motion for remittitur. The trial court found that upon the issues of "at will" employment and "just cause" for termination, the jury was presented with evidence sufficient to permit reasonable minds to reach different conclusion on Meyer's

entitlement to relief. The court also determined that in his demand for relief for breach of contract, Meyers requested damages of $50,000 without designating a reference to his first (breach of written contract) or second (breach of oral contract), cause of action. Meyers failed to amend his demand within 7 days prior to trial pursuant to Civ. R. 54 (C). Therefore, It is from this judgment that both parties appeal.

Shearson sets forth its first assignment of error as follows:

THE TRIAL COURT ERRED IN NOT STAYING THIS ACTION OR GRANTING JUDGMENT NOTWITHSTANDING THE VERDICT INASMUCH AS MEYERS ENTERED INTO A BINDING ARBITRATION AGREEMENT.

In its motion to stay this action pending arbitration, Shearson characterized the employment application as a contract. In his complaint, Meyers claimed that the August 28, 1987 letter was the employment contract.

The trial court overruled Shearson's motion citing its prior opinion, *Patterson and BancOhio Co-Executors* v. *Merrill Lynch, Pierce, Fenner & Smith* (July 21, 1988), Montgomery County Court of Common Pleas, Case No. 88-1118, unreported.

Therein, the court declined to grant movant's motion to stay proceedings pending arbitration based upon the following rationale: "The existence and content of an employment agreement signed by Patterson to arbitrate any dispute with Merrill Lynch may be decisive. Since it is unknown whether there is an employment agreement, the Court must review the pleadings in a manner most favorable to the Nonmovant." (*Patterson, supra* at 2). Likewise in the instant case, at the time of the motion to stay, it was unclear whether Meyers had in fact contracted for employment and what, if anything constituted the terms of employment.

Further, the jury verdict implicitly supports the ruling of the trial court. In finding for Meyers, the jury accepted proposition that the August 28, 1987 letter embodied the terms of Meyers' contract of employment and rejected the notion that the employment application constituted any part of that contract.

Based upon the foregoing proceedings, appellant's first assignment of error is overruled.

Appellant's second assignment of error states:

THE TRIAL COURT ERRED IN NOT GRANTING SHEARSON'S MOTION FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT INASMUCH AS MEYERS EMPLOYMENT WAS "AT WILL" UNDER OHIO LAW.

Our review of the denial of a directed verdict and a judgment notwithstanding the verdict is circumscribed by this standard: "whether reasonable minds can reach different conclusions" on the issue in question. *Mers* v. *Dispatch Printing Co.* (1988), 39 Ohio App. 3rd 99, 101.

The general rule governing the existence of an "at will" employment relationship is set forth in the syllabus of *Henkel* v. *Educational Research Council* (1976), 45 Ohio St. 2d 249:

> In the absence of facts and circumstances which indicate that the agreement is for a specific term, an employment contract which provides for an annual rate of compensation, but makes no provision as to the duration of the employment, is not a contract for one year, but is terminable at will by either party.

The *Henkel* Court reversed the decision of the appellate court in favor of appellee-employee and found that appellee's employment was "at will" rather than for a specified period of one year. Appellee's claim was based upon the following language appearing in a letter from her employer: "Dr. George Baird * * *, has authorized me to offer you a position as Research Assistant In Science, effective April 1, 1969, at an annual salary of

After reviewing the record, the *Henkel* Court found that "no evidence, including appellee's own testimony indicates that appellee was offered employment which specified one year, or any period of time, or that appellee believed the agreement to so specify." (*Id.* at 261).

The *Henkel* Court cited an earlier Ohio Supreme Court decision, *Bascom* v. *Shillito* (1882), 37 Ohio St. 431, and viewed the approach taken by the *Bascom* Court as "sound." (*Henkel, supra* at 254). The *Bascom* Court found the following jury instruction to be proper:

> [t]he issue presented was purely one of fact, that it was for the jury to say whether that which took place between the parties, as

detailed by the evidence, constituted a hiring for a year; that it was a question of intention, to be determined with reference to all the circumstances and facts of the case; that the jury should consider the previous relationships of the parties, all that was said * * * at each interview, and determine from these and all the circumstances whether it was the intention of the parties that there should be a yearly hiring.

(*Id.* at 252) (*See also*, *Mers* v. *Dispatch Printing Co.* (1985), 19 Ohio St. 3d 100, *Gaumont* v. *Emery Air Freight*, Montgomery App. No. 11199, Feb. 16, 1989, unreported).

In the instant case, in contrast to *Henkel*, the record does contain some evidence which tends to show that Meyers contracted for employment for a specified period of time.

Meyers testified that he negotiated with Hayes for "$11,000 monthly guaranty for at least six months." (Tr. 37). The jury reviewed the letter of August 28, 1987, containing the provision, $ 11,000 Monthly guarantee for 6 months" and heard Meyers testify at the letter of August 28 embodied the final terms of his employment contract. While it is true that the testimony of Hayes contradicted Meyers' assertion that the letter constituted a contract, the jury was free to assign more weight and credibility to the testimony of one party or the other.

Further, Comment (b) of 2 Restatement Agency 2d 339 indicates that Meyers' contract, as determined by the jury, was supported by adequate consideration.

> However, the fact that payment is to be made in accordance with a time unit is evidence, in connection with other relevant facts, indicating that the agreement for the period of time mentioned as that for payment, or as the basis for payments, is indicated if one party pays consideration aside from his promise to employ or to serve; * * * or if, as the principal has notice, the employee has made an important change in his general relations in order to accept the position, such as the removal of himself and his things to a new place; or if has given up a position of some value in order to enter the employment.

(Cited in *Henkel, supra* at 256).

The case of *Sterns* v. *Ohio Savings Assn.* (1984), 15 Ohio App. 3d 18 (motion to certify the record to the Supreme Court of Ohio overruled), contains facts and issues similar to those at bar. While the *Stearns* case involved a motion for summary judgment rather than a motion for either a directed verdict or a j.n.o.v., the opinion is nonetheless instructive because of its holding that appellant-employee did offer evidence which presented a jury question regarding the existence of an employment contract.

In *Stearns*, an individual brought an action against his former alleging breach of contract. The trial court granted summary judgment in favor of the employer but the Cuyahoga County Court of Appeals reversed based upon the following evidence.

Stearns was employed as a computer operator by Lubrizol Corporation when he was approached by a representative of Ohio Savings Assn. (OSA), and interviewed for a position with that institution. Stearns accepted the position after negotiating for an annual salary of $17,500. "No written employment agreement was offered or requested by either party." (*Stearns, supra* at 18). Further, "no one at OSA represented to [Stearns] that he was being given an employment contract for a year * * *except by way of the annual salary." (*Id.*)

Stearns began work at OSA in August of 1980 and in December of that year was recommended for a "$350 per merit/incentive raise effective January 1, 1981." (*Id.*) In February, 1981, Stearns was fired from OSA.

The appellate court reversed the decision of the trial court granting summary judgment in favor of OSA. This decision was based upon several considerations comparable to those in the case at bar. First, the court reviewed the general rule governing employment at will set forth in *Henkel, supra*. Then, the court listed several facts and circumstances which tended to support the claim of employment for a term: Stearns had given up a valuable position at Lubrizol to accept employment with OSA, OSA had recruited Stearns, Stearns was given an annual salary plus a per year" merit/incentive raise. (*Stearns, supra* at 19-20). The *Stearns* court held that this evidence was sufficient to present the question of the existence of an employment contract for a specific time period to the trier of fact.

The aforementioned evidence presented to the jury in the instant case was sufficient to support the verdict which reflected that a contract for employment existed between Meyers and Shearson for six months at $11,000 per month. The evidence adduced at trial was such that reasonable minds could reach different conclusions regarding the existence of an employment contract and the contents thereof. Thereof, the trial court properly overruled Shearson's motions for a directed verdict and a j.n.o.v. on the issue of "at will" employment.

Appellant's second assignment of error is overruled.

Shearson's third assignment of error is as follows:

THE TRIAL COURT ERRED IN NOT GRANTING SHEARSON'S MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT INASMUCH AS MEYERS WAS TERMINATED FOR "JUST CAUSE" AS A MATTER OF LAW.

If we should find that reasonable minds could arrive at different conclusions upon the evidence presented on the issue of "just cause" for termination, them we must overrule appellant's third assignment of error.

The traditional definition of "just cause" was explained by the Franklin County Court of Appeals in *Mers* v. *Dispatch Printing Co.* (1988), 39 Ohio App. 3d 99, 102. With reference to "just cause" for employment termination, the *Mers* court disclosed:

Essentially, each case must be considered upon its particular merits. * * * [J]ust cause, in the statutory sense, is that which, to an ordinarily intelligent person, is a person, is a justifiable reason for doing or not doing a particular act."

In the instant case, the jury was presented with the allegation that Meyers was terminated for dishonest dealings with Shearson personnel. It is well-settled that "[a]n employer may have just cause to dismiss an employee for dishonesty, even though the employee is neither charged with nor convicted of a criminal violation." *Bd of Edn.* v. *Unemp. Comp. Bd. of Rev.* (1983), 11 Ohio App. 3d 289, 191. However, the jury heard not only the testimony of Hayes, who attested to the dishonesty of Meyers, but considered evidence tending to show the unfairness of Meyers' termination.

Meyers testified that the primary reason for his appropriation of Prudential-Bache docu-

documents was to collect evidence of illegalities occurring at Prudential-Bache. He admitted that the appropriation was unlawful in that it was a breach of his contract with Prudential-Bache and agreed to a return of the documents as soon as he received the temporary restraining order.

The jury heard Meyers state that he was never given an opportunity to explain his conduct to Hayes but was instead given the choice of resigning his position or termination.

Additionally, the jury considered the testimony of Montford Will, who considered Shearson's termination of Meyers to be a hasty overreaction to the circumstances. Will indicated that prior to hiring Meyers, Meyers had disclosed his taking of the Prudential-Bache document. It was Will's conclusion that Meyers' acts constituted an "immature, isolated case" and made the "value judgment" to hire Meyers. (Tr. 104).

Credibility being an issue for the factfinder, the jury was free to believe all, part or none of the evidence presented.

In reaching their verdict in favor of Meyers, the jury implicitly indicated their decision that Shearson had no just cause for the termination of Meyers.

Because reasonable individuals could reach different conclusion upon the evidence presented on the issue of "just cause" the trial court properly denied Shearson's motion for a directed verdict and j.n.o.v.

Appellant's third assignment of error is overruled.

Appellant's fourth assignment of error states:

THE TRIAL COURT ERRED IN NOT GRANTING A NEW TRIAL INASMUCH AS IT ERRONEOUSLY EXCLUDED CRUCIAL EVIDENCE.

Appellant argues that the trial court committed prejudicial error in excluding from evidence the documents taken by Meyers from Prudential-Bache. Appellant claims that these documents went to the very heart of Shearson's case" because they demonstrate the gravity of Meyers' offense." (Appellant's Brief, p. 27).

In refusing to admit the document into evidence, the trial court reasoned that the documents added nothing to explain Shearson's decision to terminate Meyers and that Meyers had previously admitted the taking and the nature and contents of the documents. Finding these facts undisputed, the trial court declined to admit the documents.

Evid. R. 403 (B) governs the instant issue of discretionary exclusion of evidence: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

The record supports the decision of the trial court to exclude the documents in question. While it is true that the documents might have illuminated the alleged gravity of Meyers' offense, thus providing "just cause" for his termination, the jury did hear Meyers admit to the taking of the documents as well as his knowledge of their contents. Therefore, the jury was presented with sufficient evidence of the nature of the taking to justify exclusion of additional evidence upon the issue of "just cause" termination.

Shearson's assertion that the court abused its discretion in refusing to admit the documents is not supported by evidence that its decision was arbitrary, unreasonable or unconscionable. Further, if the exclusion of the documents was erroneous, we find such error to be harmless pursuant to Civ. R. 61. Appellant was not prejudiced by the exclusion because, as noted above, the jury was provided with sufficient proof as to the nature and contents of the documents.

Appellant's fourth assignment of error is overruled.

Appellee cross-appellant's first assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT SUSTAINED THE DEFENDANT'S MOTION FOR REMITTITUR OF THE JURY VERDICT.

The jury returned a verdict in favor of Meyers in the amount of $115,200, which amount was reduced to $50,000 by the trial court. The remittitur was permitted because the trail court had directed a verdict on the issue of tortious interference. Damages corresponding to that issue totalled $200,000, leaving damages of $50,000 on the issue of breach of contract given to the jury.

Appellee contends that Ohio case law supports his contention that despite the directed verdict on the issue of tortious interference, damages flowing from that claim may nonetheless be considered. This is so, argues appellee, because prior to trial, appellant was

apprised of the total potential damages including those due to tortious interference. We disagree.

In *Bishop* v. *Gardina* (1985), 20 Ohio St. 3d 26, the Ohio Supreme Court considered the issue of a reduction in damages awarded by a jury. The Court affirmed the decision to reduce punitive damages awarded to plaintiff as they exceeded the amount set forth in plaintiff's demand.

The *Bishop* Court found that Civ. R. 54(C) governed the issue. That rule states, in pertinent part: [A] demand for judgment which seeks a judgment for money shall limit the claimant to the sum claimed in the demand unless he amends his demand not later than seven days before the commencement of the trial." Plaintiff had not amended his prayer for damages prior to trial. The Court found "[a] major purpose of the limitation in the rule is to put the defendant on notice prior to trial as to his potential liability." (*Bishop, supra* at 28).

We find that *Bishop* does not control the instant case because it did not address the issue of whether damages based upon a claim no longer at issue may be considered by the jury in determining an award of damages.

Appellee further argues that the case of *Mers* v. *Dispatch Printing Co.* (1988), 39 Ohio App. 3d 99 supports his first assignment of error. In *Mers*, plaintiff demanded $50,000 in compensatory and $100,000 in punitive damages. The jury awarded $57,750 in compensatory damages and the trial court reduced that amount to $50,000. The Franklin County Court of Appeals reversed, holding: "[A]n award of damages does not have to follow the breakdown pleaded in the complaint as long as the award does not exceed the total damages asked in the Complaint." *Mers, supra* at 106. This holding is derived from the above-cited language appearing in the *Bishop* case regarding defendant's awareness of potential liability.

*Mers*, like *Bishop*, fails to address the issue of whether an award of damages may be based upon a claim no longer at issue.

While it is true that 7 days prior to trial, Shearson was aware of its total potential liability including damages for tortious interference, it is nonsensical to permit an award which includes damages for a cause of action determined to be untenable a matter of law.

We do not intend to punish appellee for pleading his damages conservatively. However,

appellee admits that many of the same damages resulted from the alleged tortious interference as from the breach of contract. If this is so, then appellee should have increased his demand for damages for breach of contract accordingly and permitted the factfinder "to match the damages to the proof brought forth." *Bishop, supra*, at 29.

Appellee argues that appellant waived his right to demand remittitur by failing to move for remittitur prior to closing arguments. However, the record contradicts this assertion.

The record discloses the following statements made by the trial court after submission of the issue of damages to the jury:

> Let the record show that just before the Court's final remarks to the jury, Mr. Bartlett had requested the Court to instruct the jury that they are limited in their finding of damages to the sum of $50,000 which is listed in the Complaint as the demand for the first cause of action.

> \* \* \*

> ". . . if the Plaintiff is limited to the $50,000 that appears in the demand on this first cause of action, the court can certainly diminish to that point if the jury verdict is inappropriate. . . ."

(Tr. 240-241; 243).

In its brief, appellant argues that the damages awarded to appellee, based on salary estimates and approximations, were speculative and conjectured. However, at oral argument, appellant admitted that should we affirm the remittitur as well as the finding of contract, damages of $50,000 are well within the sum certain of $66,000 calculable from the figures in the August 28, 1987 letter. Therefore, appellant's argument is not well taken.

For the foregoing reasons, appellee's first assignment of error is overruled.

Appellee's second assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT GRANTED DEFENDANT'S MOTION FOR DIRECTED VERDICT ON COUNT III OF PLAINTIFF'S COMPLAINT.

Count III of the complaint contained Meyers' cause of action for tortious interference.

Tortious interference has been described as follows:

> The basic principle of such an action is that one who, without privilege to do so, induces or purposely causes a third party not to enter into, or continue, a business relationship with another, or perform a contract with another is liable to the other for the harm caused thereby.

*Juhasz* v. *Quick Shops, Inc.* (1977), 55 Ohio App. 2d 51, 57.

The record contains uncontroverted testimony tending to prove that although Hayes' refusal to cooperate with Will regarding Meyers' security clearance may have delayed the transfer of Meyers' security license, it did not prevent such transfer. Hayes testified that his purpose in refusing to disclose information about Meyers was to avoid a potential lawsuit for defamation.

The record is devoid of proof that Hayes had a duty to provide Meyers' subsequent employer with security clearance information. Therefore, it would appear that Hayes took no purposeful action to thwart Meyers' potential employment with Blunt. Rather, Hayes' behavior may be categorized as inaction which did not, in fact, prevent Meyers from entering into a business relationship with Blunt.

Appellee's second assignment of error is overruled.

The judgment of the trial court will be affirmed in accordance with this opinion.

WOLFF, P.J., and WILSON, J., concur.